IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR. NO. 3:22-cr-874-MGL |
| | ) | |
| | ) | |
| -vs- | ) | SENTENCING MEMORANDUM AND |
| | ) | MOTION FOR A VARIANCE AND/OR |
| JAIME ADOLFO GONZALEZ-FARIAS | ) | DOWNWARD DEPARTURE |
| | ) | |

PLEASE TAKE NOTICE that **JAIME ADOLFO GONZALEZ-FARIAS**, by and through undersigned counsel, submits this sentencing memorandum and motion for a variance pursuant to *United States v. Booker*, 543 U.S. 220 (2005), and 18 U.S.C. § 3553(a). Both the offense conduct and Jaime's history and characteristics make this a unique case that warrants an atypical sentence. Jaime's sentencing guideline range is life imprisonment. *See* PSR at ¶ 112. By any measure, this range provides for harsh sentence for any first-time offender based on the totality of circumstances of the offence and other 3553(a) factors. Such a sentence is far greater and more severe than necessary. Additionally, a departure is warranted based upon Jaime's age pursuant to §5H1.1 of the USSG. The sentencing factors found in 18 U.S.C. § 3553(a), as well as the §5H1.1 policy statement, justify this court in sentencing Jaime to a term of imprisonment far below the applicable Guidelines range. Jaime is asking this court to grant a sentence of 120 months.

The Sentencing Guidelines provide "the starting point and the initial benchmark" for sentencing, *Gall v. United States*, 552 U.S. 38, 49 (2007), and district courts must "remain

-1-

cognizant of them throughout the sentencing process," *id*. at 50 n.6. Yet now, 17 years after *Booker*, it is "emphatically clear that the Guidelines are guidelines—that is, they are truly advisory." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008). A district court "may not presume that a guideline range is reasonable," and instead "must make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50. As a result, the court is generally free to impose sentences outside of the recommended guidelines range so long as it "consider[s] the extent of the deviation and ensure[s] that the justification is sufficiently compelling to support the degree of the variance." *Id*.

### I. Jaime's sentence should reflect his cooperation and acceptance of responsibility

Jaime's case provides sufficiently compelling circumstances to warrant a deviation from the advisory guidelines to reflect his acceptance of responsibility for pleading guilty to the underlying offense. This case demonstrates a rare example of a defendant who faces the same sentence after pleading guilty as he would have had he been convicted at trial. Usually, timely guilty pleas earn defendants reductions of three (3) levels under the Sentencing Guidelines, but in Jaime's case, his three (3) level reduction for acceptance of responsibility does not make a difference for his calculated advisory outcome. A sentence of 120 months is mandated under the statute based on Jaime's underlying offense, and the statute also provides a maximum term of imprisonment of life. 18 U.S.C. § 2423(a). As calculated in the PSR, Jaime's total offense level is 43, even with the adjustment for his acceptance of responsibility. Despite his criminal history category of I [because Jaime has zero criminal history points], the guidelines warrant an imprisonment range of life. PSR ¶ 110.

As currently calculated, the guideline range does not appreciate Jaime's acceptance of responsibility for his offense. Had he exercised his constitutional right to a jury trial and been convicted, he would have faced the same term imprisonment. Yet, readily accepted responsibility for his offense when he knowingly, voluntarily, and intelligently waived his constitutional right to a jury trial by pleading guilty. By pleading guilty, Jaime saved the government and the court precious time and resources that would have otherwise been spent to exercise his fundamental right to a jury trial and contributed to the efficiency of the criminal justice system. Moreover, Jaime saved the victim and his family from the stress and anguish that comes with a lengthy trial. His plea prevented the further victimization of the minor. Jaime's plea and acceptance of responsibility, at a minimum, warrants a three-level reduction in a Base Offense Level that would impact his guideline range. If the court started at an initial Base Offense Level of 40, which would be a three-level reduction in the 43 Base Offense Level, Jaime's new sentencing guideline range would be 292-365 months.

Importantly, and moving forward, if no benefit is derived from a defendant willingly accepting a plea and foregoing trial, defendants will be far more reluctant to negotiate and enter pleas. Outside of making the Government meet its burden of proof, if a defendant does not benefit by accepting responsibility, the next case will require that a victim testify because a defendant will likely proceed with a trial. It is important to impose sentences that take into account these factors. Jaime's actions are compelling, and he should receive a great benefit in his sentencing range by accepting responsibility in this matter.

II.  **The nature and circumstances of the offense and the history and characteristics of the defendant pursuant to 18 U.SC. § 3553(a)(1)**

a. History and characteristics of the defendant

Father Gonzalez, also known to his congregation as Father Jaime, was born and grew up in Chile.  Today he is a dual citizen of the United States and Chile—he became a United States citizen in 2018.  He turned 69 years old in December of 2023.  He has been a priest for over 30 years. Prior to becoming a priest, Jaime worked in biochemistry.  He went to college when he was 17 and got a degree in chemistry at the University of Chile.  After obtaining his degree, he became a medical technologist.

Jaime has been religious his entire life, and when he was 21 years old, Jaime was an active member of a church in Chile.  In his early 20s, Jaime began attending spiritual retreats with monks who lived outside the city of Santiago in a monastery.  Jaime enjoyed the monks' solemnity, devotion, and humility, and this community of monks became his family.  One of the monks shared with Jaime that he thought Jaime had a genuine vocation to the priesthood.  Guided by the monks, Jaime entered seminary in 1982.  In 1990, Jaime became an ordained Catholic priest by the Universal Catholic Church.

After being ordained, Jaime began his ministry in Chile where he worked until 2001, when he moved to the United States.  Jaime served as a priest in New Jersey from 2001 to 2006; in Florida from 2006 to 2010/2011; and then returned to Chile for about four years.  He returned to the United States in 2015, and worked at Blessed Trinity in Greer, South Carolina until 2020.  After serving at Blessed Trinity in Greer, he was asked to serve three smaller Catholic churches in Newberry, Joanna, and Laurens.  This was his final appointment.

For over 30 years, Jaime selfishly served his congregation. In the United States, he worked to help and improve the Anglo/Hispanic community, helping those members navigate life in the United States. Members of the churches where Jaime has served were shocked to hear of this case. Several, over 23 individuals or families, wrote letters of support for him.[1] Members of his churches have written the following about his ministry:

- "He was very caring about his church family, their needs and worked diligently to blend the Hispanic and Anglo communities that comprise the church."

- "We spent our years with Father Jaime, learning and growing. Through his influence, I became a Lector, and not a Catechist."

- "We spent time with Father Jaime inside and outside the church, and recognized his great work as a priest and as a friend, always trying to help the Anglo/Hispanic community, striving to improve our community."

- "From the time that Father Jaime was assigned to our parish his guidance, and his faith on out community made a difference to bring it together."

- "[Our family has] known Father [Jaime] since 2001. We met him at St. Mary of the Assumption Cathedral in Trenton, New Jersey, . . As a family, we participated actively in the church of Mt. Holly, as lectors, Sacred Eucharist ministers, workshop, and bringing communion to sick people; all under the guidance of Father Gonzalez Farias."

---

[1] Letters in support of Jaime were presented to the court for review during his Detention Hearing. Out of an abundance of caution, and to keep the confidentiality for those members, defense counsel will summarize those letters here rather than attach them as exhibits to this motion. They will be available for review upon request of at Jaime's sentencing.

- "He was a kind, loving, and respectful man of God. He put so much effort into growing the church. He was respectful to everyone be that adults or children."

After being ordained, Jaime moved to a foreign country, overcame a language barrier, and did important work in the church, often bridging groups together. The members of his churches miss him and have expressed shock over his federal case because it was out of character for him and an isolated incident. Jaime is still a man of God, and he continues to pray regularly. He has prayed with several detainees while awaiting a resolution of his case. This case will not and should not undo the decades of his ministry.

Jaime has written to the victim's family and to the court to express his regret over what occurred in this case. In a letter to the court, Jaime writes that he regrets "absolutely" his actions and asks for God's forgiveness. *See* Court Letter attached here to as Exhibit 1. In a letter to the victim's family Jaime again expresses "profound regret" because he has failed God and "our Catholic church." *See* Letter to Family attached hereto as Exhibit 2. He further writes that the family's anger and pain is justified, and his words will not lessen the pain the family faces. *Id.* Finally, he expresses his remorse and is truly sorry for the harm he caused and for violating the family's trust. *Id.*

Jaime knows that he has harmed someone and his family, and he wants to be held accountable for his actions, while at the same time he is asking the court to show mercy.

    b. <u>Nature and circumstance of the Offense</u>

The conduct that is the subject of this offense is an isolated incident, and there is a single victim. Outside of this case, there are no allegations of abuse from any church in the three states where Jaime served. In fact, the FBI issued a notice, requesting that others who have information

about this case or know details of any other victims to please come forward—none have. This is an isolated incident concerning someone with zero criminal history.

The circumstances of the offense warrant some discussion. The nature and circumstances discussed below are not to be offered as a defense or excuse for Jaime's actions. Rather, they are solely being offered to put the conduct into context. The height of the COVID-19 pandemic was at its peak in 2020. Many public events and church-related events were cancelled. Many people, including clergy, were in extreme isolation. In May of 2020, Jaime received word that his mother, who was still living in Chile, had died. Specifically, on May 7, 2020, Jaime's mother, who suffered from serious health conditions, died in her sleep. At this time, Jaime was estranged from his father who, coincidentally, died of a heart attack exactly one year later, on May 7, 2021. Jaime felt like an orphan following his mother's death. At the time, he could not return to Chile to visit with his family and to have a funeral for her. At this point, Jaime was in a very dark place and was experiencing extreme grief. He had nowhere to turn and no family in the United States to share in his grief.

Jaime continued to work as priest and work with members of his congregation. What started as outreach with the victim and the victim's family went too far. Jaime knows that, and he feels great shame and remorse from his actions. However, under either the victim or Jaime's recollection of events, the physical part of the incident was not extreme. No one has been harmed sexually—this case alleges inappropriate touching. There has been no allegation of rape whatsoever.

Though the specific conduct is difficult to discuss, these are important distinctions and make a difference in applicable penalties under the South Carolina Code. There are three

degrees of conduct under the South Carolina for criminal sexual conduct ("CSC") with a minor. *See* S.C. Code Ann. § 16-3-655. The highest degree of conduct Jaime could be facing under state law is found in section 16-3-655(C) of the South Carolina Code, or third-degree CSC that carries a ***maximum*** penalty of 15 years. *See* S.C. Code Ann § 16-3-655(D)(4). The federal statutes and the federal sentencing guidelines do not have distinctions for the types of conduct committed based on the broad definition of "sex act" under both. Notably, the conduct here does not meet the definition of "sexual battery" under the South Carolina Code. *See* S.C. Code Ann. § 16-3-651(h). Again, this explanation is offered to put context on the events that transpired and not make excuses for Jaime's actions.

      c. <u>The Specific Offense Characteristics Apply Too Frequently, Increase the Sentencing Range Exponentially, and Conflict with the Statutory Ranges</u>

The sentencing guideline Jaime faces is extreme. Due to the unique history of § 2G, offenses involving sexual exploitation of children, among other considerations, courts have been less deferential to and more skeptical of the guideline ranges produced under § 2G2.

By entering his plea to violating 18 U.S.C. § 2423(a), Jaime's base offense level began at a 28—already a high starting point. He then received every single enhancement provided for in § 2G3.1(b). Many of the enhancement are duplicative to elements of Jaime's plea and doubly punish him. At least two of the enhancements, §2G1.3(b)(2)(B) and §2G1.3(b)(4)(A) are part and parcel of the elements within 18 U.S.C. § 2423(a). Further, the computer enhancement found in §2G1.3(b)(3)(A) is obsolete and overused.

Additionally, Jaime received two substantial enhancements pursuant §2G1.3(b)(5) and §4B1.5(b)(1). The eight-level enhancement Jaime received in chapter 2G concerns the victim's

age. Notably the victim was 11 years old in this instance. South Carolina law rather than federal law imposes specific penalties for a victim who is "at least eleven years old." *See* S.C. Code § 16-3-655 (defining second-degree CSC as sexual battery with a victim who is fourteen years of age or less but who is at least eleven years of age). The age of less than one year difference imposes an eight-level increase under the guidelines. An eight-level swing in Jaime's BOL is a difference between life imprisonment and a guideline range of 168-210 months.

Finally, concerning the pattern of conduct enhancement, Jaime has withdrawn an objection concerning this enhancement based on the language defining "pattern" pursuant to §4B1.4(b). However, Jaime alternatively asks that the court vary or disregard this significant and unnecessary enhancement based on reasons similar to those outlined in his objection. The definition provided for "pattern of conduct" in the guidelines is far broader than necessary. Rather, the plain meaning of "pattern of conduct" should be defined to mean a series of acts that are regularly consistent, or, greater than two. *See*, *e.g.*, *Sedima, S.P.R.L. v. Imrex Co. Inc.*, 473 U.S. 479, 496 n.14 (1985) ("[I]n common parlance two of anything do not generally form a 'pattern.'"). Here, as indicated above, there is one victim, and this conduct was isolated. Further, Jaime has zero criminal history and has never been accused of abuse outside of this incident. For all of these reasons, Jaime asks that the court disregard this enhancement for sentencing purposes.

II.     **The need for the sentence imposed to reflect the seriousness of the offense, to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant**

Jaime acknowledges the seriousness of his offense and is deeply remorseful, embarrassed, and ashamed of his conduct. He knows that this conviction will further alienate

him from his church family and friends. While the Court must impose a sentence that "afford[s] adequate deterrence to criminal conduct," it is not necessary to imprison Jaime for a period of longer than 10 years to accomplish that goal.

Jaime appreciates that he will be sentenced to a substantial period of imprisonment. We respectfully submit that the statutory mandatory minimum sentence of 120 months, or 10 years, followed by an appropriate period of supervision, will constitute adequate punishment for Jaime and serve as a forceful, tangible reminder to the community of the seriousness of the offense. Further, the requirements of Jaime's supervised release are significant and also constitute an adequate punishment. 120 months of incarceration is more than adequate to defer further criminal conduct.

As indicated below, age and criminal history are the two biggest indicators of recidivism. Both factors here indicate that Jaime will not recidivate. Jaime is 69 years old and has zero criminal history. Jaime is facing not only a lengthy period of incarceration but also lifetime supervision. A 120-month sentence will protect the public from further crimes of the defendant while he is incarcerated and, just as importantly, permit Jaime to be adequately treated, further reducing the risk of recidivism.

### III.     The kinds of sentences available pursuant to 18 U.SC. § 3553(a)(3)

The only kind of sentence realistically available to Jaime is a lengthy term of imprisonment. The Bureau of Prison's policy will require him to serve 85% of his sentence at a minimum, and Jaime will be prohibited from receiving programming credits under the First Step Act. The type of institution Jaime will serve his sentence in depends upon a security point score combined with certain public safety factors. One public safety factor is when a defendant has

more than 20 years remaining on his sentence. Bureau of Prisons policy requires any defendant with more than 20 years remaining on his sentence to be designated to a Medium Security Prison.

It is widely known that sex offenders are typically subject to maltreatment in prison. The court in *United States v. Liwanag* referenced this maltreatment.[2] 372 F. Supp. 3d 68, 73 (E.D.N.Y. 2019). The court noted:

> The seriousness of the defendant's offense will likely result in an unsafe and challenging environment in prison. Sexual assault offenders are often at risk of violence at the hands of other inmates, since they are a "disfavored" group within prison populations. *See* Alice Ristroph, *Sexual Punishments*, 15 Colum. J. Gender & L. 139, 159–60 (2006) ("[S]ex offenders ... are subject to heightened abuse from both corrections officers and fellow inmates."); *see also* James E. Robertson, *A Clean Heart and an Empty Head: The Supreme Court and Sexual Terrorism in Prison*, 81 N.C. L. Rev. 433, 462 (2003) ("inmate norms call for the[ ] savage beating [of sex offenders convicted of victimizing children]"). He will presumably be required to spend time in solitary confinement or areas of increased security because prisoners "will often will go to great lengths to injure or even kill" sex offenders, especially those who have committed crimes against children. Dennis Giever, *Jails* in *Prisons Today and Tomorrow* 414, 448 (Joycelyn M. Pollock ed., 1997). Liwanag's time in prison will undoubtedly be difficult.

*Id.* Jaime is facing a lengthy sentence and completing it will most certainly be in a challenging environment. He asks that the court consider his inability to earn programming credits as well as the challenging environment he will be forced to survive in when imposing his sentence.

Though Jaime faces life imprisonment, decreases in Base Offense Levels for a defendant in Criminal History Category I have a dramatic effect on guideline ranges. As noted throughout,

---

[2] In *Liwanag*, a 27-year-old was sentenced for sexual exploitation of a child. 372 F. Supp. 3d 68. That defendant recorded some of these interactions and posted some on the internet for others to view. *Id.* Liwanag had a criminal history category of I, and his offense level was 43. *Id.* This produces a guideline range of life imprisonment. Though he faced a 30-year maximum sentence, the district court imposed a 15-year sentence. *Id.* The government did not appeal. *Id.*

Jaime's guideline range is life imprisonment, and this range is inflated for the reasons described above. If Jaime were to receive a variance for even a few of the enhancements, such as a reduction for the overused computer enhancement and the other duplicative enhancements mentioned above, his unadjusted Base Offense Level would be significantly lower, even within a guideline range of 120 months. 120 months is well within the range of available sentences in this matter.

### IV.   The need to avoid unwarranted sentencing disparities among defendants with similar records that have been found guilty of similar conduct.

Each case is different and, as described above, there are meaningful differences between this case and another sexual exploitation of a minor case. As noted above, the most similar crime associated with this offense in state court is third-degree criminal sexual conduct. Under South Carolina law, such an offense carries a maximum penalty of 15 years imprisonment.

Though difficult to find cases directly on point with the facts here, the sentence requested here is consistent with the sentences imposed in several cases in this jurisdiction in the past several years. *See e.g.*, *Coogle v. United States*, No. 2:17-CR-00167-01, 2020 WL 8484871, at *2 (S.D.W. Va. Feb. 11, 2020), *report and recommendation adopted*, No. 2:17-CR-00167-01, 2021 WL 126206 (S.D.W. Va. Jan. 13, 2021) (where the Court applied a three-level downward variance from the recommended sentence of 168 to 210 months under the USSG, sentencing Coogle to 121 months imprisonment, which amounted to just one month more than the statutory minimum sentence); *United States v. Liwanag*, 372 F. Supp. 3d 68, 73 (E.D.N.Y. 2019) (where the court imposed a 15 years sentence for sexual exploitation of a child); *United States v. Fernando*, 291 F. App'x 494, 495 (4th Cir. 2008) (following a jury trial, the court imposed a

120-month sentence for using interstate commerce to coerce or entice a minor to engage in illegal sexual activity).

Accordingly, in light of those sentences and the parallel/applicable South Carolina Code section, a sentence of 120 months here would not create a sentencing disparity, especially considering Jaime's age.

**V.    The need to provide restitution to any victim of the offense.**

The victim in this matter and his family are seeking restitution from Jaime. Jaime did not object to the amount requested, agreed to the figured, and is prepared to pay the requested restitution as soon as the court imposes the requested amount. In fact, Jaime will be in court with a check for that amount made out to the South Carolina District Court for the restitution requested.

**VI.    Motion for Downward Departure**

A departure is warranted based upon Jaime's age pursuant to §5H1.1. §5H1.1 of the sentencing guidelines which provides:

> Age may be relevant in determining whether a departure is warranted, if considerations based on age, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines. Age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a firm of punishment such as home confinement might be equally efficient as and less costly than incarceration.

Jaime is 69 years old. In the social security actuary table, a male aged 69 has a life expectancy of 83.24 years, or 14.24 years of life remaining. *See* Actuarial Table attached as Exhibit 3. Thus, a sentence of anything equal to or more than Jaime's life expectancy is essentially a life sentence, also known as a "*de facto* life sentence." Recognizing that "death in prison is not to be

-13-

ordered lightly," courts often consider evidence of life expectancy in cases in which a sentence may amount to a life sentence. https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220726_Older-Offenders.pdf (last visited February 2, 2024). Moreover, the actuarial life table provided for by the social security administration is a measurement of the population with access to adequate healthcare and not a measurement of an incarcerated prison population. Life within the BOP is notably more difficult and ages inmates at a faster rate. *See id.* (noting "[t]he aging process accelerates once an offender is incarcerated and offenders can feel relatively old at a younger age and physical changes may stand out earlier").

One USSG study found that based on several factors, "[t]he use of alternative sentences dramatically increased as offenders' age increased[, and] [n]early a third (31.3%) of offenders ages 65 through 69 and more than 40 percent (42.1%) of offenders 70 and older received probation, a fine, or other alternative to incarceration sentence in fiscal year 2021." *Id.* Further, studies have shown that the risk of recidivism decreases with age. *See id.* Additionally, criminal history is one of the strongest predictors of future recidivism, with more serious criminal history being associated with a greater likelihood of recidivism following release from imprisonment. *Id.*

Based on his life expectancy, a departure is warranted based upon Jaime's age. Jaime is facing the very stark and very real possibility that he could die while serving his final years within the BOP. He is asking that the court depart from the guidelines and give him a sentence that offers a realistic hope that he could live at least part of his remaining time here outside of the confines of the BOP.

## CONCLUSION

Jaime respectfully requests that, for the reasons set forth in this memorandum, the Court grant a variance and/or departure to a sentence of 120 months. The federal sentencing guidelines provide for an extreme and harsh sentence for Jaime, who is a first-time offender. The sentencing factors found in 18 U.S.C. § 3553(a), as well as the USSG policy statement in §5H1.1, justify this request.

Respectfully submitted,

s/Jenny D. Smith
Jenny Draffin Smith
Assistant Federal Public Defender
Federal Public Defender's Office
1901 Assembly Street, Suite 200
Columbia, South Carolina 29201
(803) 765-5076
Attorney ID No. 10803
jenny_d_smith@fd.org

Columbia, South Carolina
February 5, 2024.